**PERMANENTE S. S. CO. v. HAWAIIAN DREDGING CO., Limited, et al.**

**No. 23975.**

District Court, N. D. California, S. D.

Oct. 22, 1945.

Graham & Morse and Paul S Marrin, all of San Francisco, Calif., for libelant.

Frank J. Hennessy, U. S. Atty., and Esther B. Phillips, Asst. U. S. Atty., both of San Francisco, Cal. (Frank Staley and Leavenworth Colby, both of Washington, D. C., and Arthur M. Becker, of

---

[2] The quotation is from Sec. 717, Title 18 U.S.C.A.

322

New York City, of counsel), for respondents.

ROCHE, District Judge.

### Findings of Fact

I. All of the parties and the subject matter of both the first and second causes of action herein are within the admiralty and maritime jurisdiction of the United States and of this Court.

II. At all times pertinent, libelant Permanente Steamship Company was a corporation duly organized and existing under the laws of the State of Nevada, having a place of business and doing business in the State and Northern District of California, Southern Division, and was the owner of the Steamship Philippa (formerly named and designated as the SS Cristobal), official number 145,934, and Permanente (formerly named and designated as the SS Ancon) official number 115,125, lawfully documented vessels of the United States.

III. At all times pertinent, respondents and each and all of them were corporations organized and existing under and by virtue of the laws of one or another of the States of the United States, having places of business and doing business in the State and Northern District of California, Southern Division.

IV. On or about the 21st day of March, 1941, in the Northern District of California, Southern Division, demise charters identical in form were duly entered into in writing by and between the libelants and the respondents whereby the libelant, as owner of the said Steamship Philippa and Permanente agreed to let and demise and the respondents, as charterers, agreed to hire and possess said vessels for the period of one year from and after date of delivery, with option to renew, for a charter hire to be computed at the rate of Three Dollars ($3) per deadweight ton per month. Said Steamship Philippa had and has a deadweight tonnage of 11,158 tons, and said Steamship Permanente had and has a deadweight of 11,114 tons. Exhibit A annexed to the libel is a true copy of the charter party entered into by and between the parties hereto covering the Steamship Permanente and an identical form of charter party, save for the names and tonnage of the respective vessels and the dates of execution, was entered into between the parties hereto covering the Steamship Philippa.

V. Thereafter, and on the 30th day of October, 1941, the parties to the said charters, libelant and respondents herein, entered into an agreement in writing extending the term of said two charter parties to and including December 31, 1943.

Exhibit B annexed to the libel is a true copy of said extension agreement.

VI. Said Steamship Permanente was delivered to and accepted by respondents on the 13th day of March, 1941, at 2:00 o'clock P. M., Pacific Standard Time, and from said date and hour to and until the 30th day of July, 1942, at 12:01 o'clock, A. M., Pacific War Time, said vessel was in the exclusive possession and use of respondents and during said time was under the sole management, control, operation, manning, victualing and navigation of respondent and was not in the possession or use of libelant.

Said Steamship Philippa was delivered to and accepted by respondents on the 28th day of April, 1941 at 8:00 o'clock A. M., Pacific Standard Time, and from said date and hour to and until the 25th day of July, 1942 at 12:01 o'clock A. M. Pacific War Time, said vessel was in the exclusive possession and use of respondents and during said time was under the sole management, control, operation, manning, victualing and navigation of respondents and was not in the possession or use of libelant.

Said Steamships were never at any time since the date of their delivery to respondents nor since any other times mentioned herein redelivered into the possession of libelant.

VII. On February 7, 1942, the President of the United States, by Executive Order 9054, created within the Office for Emergency Management of the Executive Offices of the President, a War Shipping Administration, under direction of an Administrator vested with the power and charged with the duty, among other things, to control the operations, purchase, charter, requisition and use of all ocean vessels under the flag and control of the United States, (with certain exceptions not here material) and to allocate such vessels for use by the Army, Navy, or other departments or agencies, or for use by the governments of the United Nations.

VIII. On or about April 19, 1942, the Administrator, War Shipping Administration, pursuant to the said Executive Order of the President, directed the requisition for use on a time charter basis, effective

as of the time of the Government's taking possession thereof, of all merchant vessels of the United States of over 1,000 gross tons, including libelant's said Steamships Permanente and Philippa. Respondents' Exhibit A in evidence is a copy of a telegram, dated April 19, 1942, addressed to libelant and sent for the purpose of notifying it of the requisition of the two named vessels as aforesaid. Telegrams in the same form were sent at or about the same time to all other owners of merchant vessels of the United States of over 1,000 gross tons.

IX. Thereafter, the Administrator determined to modify the terms of requisition as to certain vessels, including libelant's said Steamships Permanente and Philippa, from a requisition for use on a time charter basis to a requisition for use on a bareboat or demise charter basis. Accordingly, on or about May 16, 1942, the · Administrator, War Shipping Administration, directed the modification of the previous notification referred to in Finding of Fact designated VIII hereof and provided for the requisitioning for use of said two Steamships on a bareboat or demise charter basis, effective upon their delivery to representatives of the Administrator. Respondents' Exhibit B in evidence is a copy of a telegram dated May 16, 1942, addressed to libelant and sent to it for the purpose of notifying it of such modification. Telegrams in the same form were sent at or about the same time to all other owners of merchant vessels of the United States in every instance where the Administrator had determined to modify the terms of their requisition for use from a time charter basis to a bareboat or demise charter basis.

X. The War Shipping Administration dealt solely with libelant with respect to all matters concerning the requisition of said Steamships. It did not deal with respondents concerning such matters. The telegraphic notices of requisition aforesaid were addressed to and sent only to libelant. For fifteen months after libelant received the first requisition notice, libelant conducted negotiations with the War Shipping Administration as to the compensation to be paid to it on account of the requisition for use of said Steamship and as to the form of requisition charters which it claimed the Government was required to tender to it as a result of the requisition. Respondents had notice of the requisition but the War Shipping Administration did not at any time give formal notice thereof to respondents nor negotiate with respondents either as to the conditions of the requisitions, their effective dates, the terms of the requisition charters to be tendered, or the compensation to be paid because of the requisitions for use of the vessels; neither did respondents negotiate nor attempt to negotiate with the War Shipping Administration with respect to any of such matters.

XI. Subsequent to the receipt of the aforesaid telegram of April 19, 1942, and both prior to and subsequent to the receipt of the aforesaid telegram of May 16, 1942, libelant requested the Administrator and his authorized representatives not to effectuate said requisitions. These requests were denied and the Administrator, acting through his authorized representatives, by way of effectuation of the requisition for use, of which notification was given to libelant by said telegram of May 16, 1942, took possession of said SS Philippa on July 25, 1942, for use on a bareboat or demise charter basis, and thereafter on July 30, 1942, took possession of the said SS Permanente for use on a bareboat or demise charter basis, and delivered by mail to Carl R. Olson, a representative of libelant, delivery receipts for each of said vessels.

XII. By the taking of possession of said Steamship as aforesaid the government of the United States effected actual and full requisition of the use of said vessels and each of them as and from the respective dates free from any and all conditions or restrictions upon their use or employment. From the time the Government of the United States took possession of said Steamships as aforesaid, said Steamships have been and now are in the exclusive possession, use, management, control, operation and navigation of the government of the United States; from said time they have not been in respondents' possession, use, management, control, operation or navigation. Cargo belonging to respondents has from time to time been carried upon said Steamships but when so carried has been exclusively in the possession, custody and control of the government of the United States and its agents or representatives.

XIII. The War Shipping Administration requisitioned the use of the Steamships Permanente and Philippa in rem and

not the respondents' contractual rights to the use of them under the terms and conditions of the charter parties and extension agreement in suit. The terms and effect of said charter parties and said extension agreements gave the possession and use of said vessels to respondents and they were required to man, victual, supply and navigate said vessels, but restricted the use of said Steamships to carrying lawful merchandise owned by or for the account of the respondent charterers for the United States of America or an agency or department thereof (Article 3); to trading in safe ports, including those in the islands of Cebu, Midway, Wake, Guam, Palmyra and Johnston, and such islands as might be designated under a certain Contract NOy–4173, between respondents and the United States Navy Department, Bureau of Yards and Docks (Article 3). They defined safe ports as those free from war as well as marine risks (Article 3); prohibited the use of the vessels by the respondent charterers in "waters or areas known to be dangerous to navigation by reason of war or warlike operations or otherwise" (paragraph 32); provided that in the event of war the libelant-owner had the sole option either to terminate on ten days' notice or to permit the respondent charterers to use the Steamships in some other safe trade (Article 3 and 32); provided for termination of the charters in any event by December 31, 1943, as extended by the extension agreement of October 10, 1941; provided also that the charters could be terminated for a variety of causes specified in paragraph 39; gave to the libelant-owner a lien upon all cargoes and subfreights for any amounts due under the charters and gave to the respondent-charterers a lien upon the vessels for all moneys paid in advance to the libelant-owner and not earned (Article 18). They further require the respondent-charterers, at their own expense, to obtain Protection and Indemnity Insurance satisfactory to the libelant-owner, in the sum of $1,000,000 for each vessel and have this insurance extended to protect any liability which the libelant-owner might incur; required the respondent charterers to maintain War Risk Insurance in the sum of $1,000,000 for each vessel and have the libelant-owner included as an insured thereunder as the libelant-owner's interest might appear; required the libelant-owner to maintain insurance in the sum of $1,000,000 for each vessel against fire and marine risk and

disaster and have the respondent charterers included as an insured thereunder as the respondent-charterers' interest might appear; contained several other provisions relating to insurance (Article 19); and gave the libelant-owner the right to control the employment of the masters and chief engineers of the vessels (Article 5). The use of said vessels taken by the War Shipping Administration was subject to none of the restrictions aforesaid and was without regard to any contractual rights of libelant and respondent under said charter parties. Said charter parties were not kept alive nor resorted to in order to determine anything involved in the transaction of requisition between the War Shipping Administration and libelant. The benefits of the insurance provisions of said charter parties were not taken by the War Shipping Administration nor did it determine either the length of time it could use the vessels, the purpose for which they could be used, the areas in which they could be used, nor the compensation to be tendered to libelant by reference to said charter parties.

XIV. At the time the War Shipping Administration took possession of said steamships under said requisitions and for sometime prior thereto, libelant knew that the War Shipping Administration did not consider itself as bound by the terms of said charter parties and knew that in taking the vessels the War Shipping Administration did so in order to put them under the exclusive control of the Government of the United States so that they might be used without restriction in the manner most beneficial to the United States in the prosecution of the war; that in the light of such facts, common knowledge as to the state of the war at the time the vessels were taken, and the general war program of the Government of the United States, it was evident that the Government of the United States in all probability would retain the use of said Steamships under its requisition long beyond December 31, 1943, the expiration date of the pre-existing charter parties between libelant and respondents. The Government of the United States has in fact so retained said vessels beyond the expiration date of said charter parties.

XV. After War Shipping Administration took possession of said Steamships under said requisitions, the libelant, without protest, permitted the respondents to cease

performance of all their obligations under the charter parties in suit. Said charter parties, by Article 7, required the vessels to be "drydocked, cleaned, painted by the charterer as may be necessary, but at least once in every eight calendar months"; by Article 19, required the respondent charterers, at their own expense, to maintain protection and indemnity insurance and war risk insurance in the sum of $1,000,000 for each vessel satisfactory to the libelant-owner and extending to any liability or loss of the libelant-owner; and by various provisions made it the respondent charterers' obligation to make surveys when necessary, obtain seaworthy certificates when the vessel sailed, and perform other acts. For the fourteen months prior to the requisition, the respondent charterers did in fact maintain the insurance, drydock and inspect the vessels, and obtain seaworthy certificates when the vessels sailed. After the requisitions became effective, respondents cancelled the insurance required by the charter parties to be satisfactory to the libelant, no longer had the vessels drydocked and inspected, no longer obtained seaworthy certificates for the vessels, nor made the surveys of the vessels required by the charter parties. Said charter parties required hire to be paid monthly and for the eleven months prior to the requisition of the vessels the libelant-owner billed the respondents each month and the respondents paid charter hire each month; after the requisitions became effective, the respondents ceased paying charter hire.

XVI. All of the foregoing was well known to libelant and it knew that the respondent had many times stated and indicated that they considered said charter parties at an end. Libelant did not protest the failure on the part of respondents to perform their obligations under said charter parties nor did it call upon respondents to perform the same. Libelant ceased billing respondents for charter hire after the requisitions became effective in July 1942 and did not resume billing the respondents until September 1943. After the requisition became effective, libelant ceased to perform all of the obligations which said charter parties required it to perform on its part. It cancelled the marine insurance on the vessels which said charter parties required it to maintain; it cancelled its contract for radio equipment on the vessels and from the time the requisitions became effective it never at any time performed any of the obligations which said charter parties required it to perform.

### Conclusions of Law

I. That the Government of the United States, acting through the Administrator, War Shipping Administration, on the 30th day of July 1942, effected actual, complete and full requisition of the unrestricted and unlimited use of the SS Permanente and took exclusive possession of her. The government of the United States, acting through the Administrator, War Shipping Administration, on the 25th day of July, 1942, effected actual, complete and full requisition of the unrestricted and unlimited use of the SS Philippa and took exclusive possession of her.

II. That the requisition of the use of said SS Permanente by the Administrator, War Shipping Administration, on July 30, 1942, and said SS Philippa by the Administrator, War Shipping Administration on July 25, 1942, frustrated and terminated the libelant's and respondents' rights and obligations under the terms and provisions of the charter parties in suit.

III. That after the requisitions of said Steamships became effective, the libelant and the respondents by their conduct, mutually abandoned their rights and obligations under the terms and provisions of said charter parties.

IV. That the libelant should recover nothing by the libel and the respondents are entitled to judgment dismissing the libel on the merits, and that each of the parties hereto bear their own respective costs.

Let a decree be entered accordingly.